IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

TEASHOT.LLC, a Colorado limited liability company,

      Plaintiff,

v.

GREEN MOUNTAIN COFFEE ROASTERS, INC., a Delaware corporation;
KEURIG, INCORPORATED, a Delaware corporation; and
STARBUCKS CORPORATION, a Washington corporation,

      Defendants.

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff Teashot.LLC, for its Complaint against Defendants Green Mountain Coffee Roasters, Inc., Keurig, Incorporated and Starbucks Corporation, hereby states as follows:

### I. THE PARTIES

1.    Plaintiff Teashot.LLC is a Colorado limited liability company having a principal place of business at 408 South Pierce Avenue, Louisville, Colorado 80027-3018 ("Teashot"), and was formed by Mr. Barry Cooper ("Mr. Cooper") to hold, license and enforce U.S. Patent No. 5,895,672.

2.    Defendant Green Mountain Coffee Roasters, Inc. is a corporation organized under the laws of the State of Delaware, having a business address of 33 Coffee Lane, Waterbury, Vermont 05676 ("GMCR").  GMCR is subject to service of process in Colorado through its

Registered Agent, United Corporate Services, Inc., 10725 West 85th Place, Arvada, Colorado 80005.

3.     Defendant Keurig, Incorporated is a corporation organized and existing under the laws of the State of Delaware, having a business address of 55 Walkers Brook Drive, Reading, Massachusetts 01867 ("Keurig").   Upon information and belief, though conducting substantial business within the State of Colorado, Keurig has not appointed an agent to accept service of process within the state.  Keurig is a wholly owned subsidiary of GMCR.

4.     Defendant Starbucks Corporation is a corporation organized and existing under the laws of the State of Washington, having a business address of 2401 Utah Avenue South, Seattle, Washington 98134 ("Starbucks").  Starbucks is subject to service of process in Colorado through its Registered Agent, Prentice-Hall Corporation System, Inc., located at 1560 Broadway, Suite 2090, Denver, Colorado 80202.

## II.  JURISDICTION AND VENUE

5.     This action arises under the laws of the United States, 35 U.S.C. § 101 et seq., for patent infringement.  The Court has original subject matter jurisdiction over the asserted claim pursuant to 28 U.S.C. §§ 1331 and 1332.

6.     GMCR, Keurig and Starbucks are subject to personal jurisdiction in this judicial district because:  (1) as they regularly conduct business within and have had systematic and continuous contacts with this judicial district; (2) the activities giving rise to Teashot's claims occurred, at least in part, within this judicial district; and (3) Teashot has been damaged in this judicial district by GMCR's, Keurig's and Starbucks' tortious conduct.

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because GMCR, Keurig and Starbucks are subject to personal jurisdiction in this judicial district, and at least a part of the events giving rise to the asserted claim and damage resulting therefrom occurred in this district.

### III.  GENERAL ALLEGATIONS

### A.    Mr. Cooper's Tea Expertise

8.     Mr. Cooper was born in England and raised in the Highlands of Kenya, East Africa, the heart of Kenya's tea growing region.  He joined Lipton (Overseas) Ltd. as a tea trainee in 1965, eventually moving to America in 1971 as a member of Thomas J. Lipton Inc., where Mr. Cooper participated in all aspects of sourcing and selecting tea.  He traveled extensively around the world as part of the Lipton Tea Buying Group.  Mr. Cooper ended his career with Lipton to participate as an investor and manager in the leveraged buyout of Celestial Seasonings, Inc. ("Celestial") from the Kraft Corporation.

9.     Mr. Cooper served as Vice President of Research & Development at Celestial (1988 - 1990) and subsequently as Vice President of Operations at Celestial.  In 1992, he left Celestial to form his own company, Sandbar Trading Corporation, specializing in Botanicals, Spices and Tea, with manufacturing facilities in Ceylon, Thailand and Indonesia.  Sandbar Trading Corporation was engaged in manufacturing for both private label sale of product and Mr. Cooper's own products.

10.     Mr. Cooper subsequently founded and became Chairman of Cooper Tea Company, whose branded products include all-natural, shelf stable, liquid tea concentrates marketed as  "B.W. Cooper's Iced Brew Tea."  Mr. Cooper is also the Chairman of Cooper

Venture Associates whose worldwide operations include private label tea packing, herb and peppermint processing, tea, herb and spice trading, and health and beauty aids.

11.     In 2007, Mr. Cooper introduced a novel "ready to drink" concept marketed under the brand name BAZZA High Energy Tea ("BAZZA"). The breakthrough tea product was launched nationally with the 7-Eleven Corporation and was subsequently acquired by BYB Brands Inc., a wholly owned subsidiary of Coca Cola Enterprises.  BAZZA is now being distributed by Coca Cola Ltd. in the United States.

12.     Mr. Cooper has written a book about his life in the tea field, entitled "Silver Spoons, Mad Baboons, and other tales of Tea."  The book won the 2008 Independent Publishers Silver Medal for the best business autobiography of the year.

13.     Mr. Cooper is a past Chairman of the Board of the U.S. Tea Association, and has been asked to serve again in this capacity for 2012 and 2013.  Mr. Cooper has served on the U.S. Food and Drug Administration Board of Tea Appeals, as a U.S. Delegate to the International Standards Organization.  He serves as an advisor to the U.S. Government representative on all international tea issues at FAO meetings.

14.     Mr. Cooper is recognized as an International Tea Master, with over 46 years of experience in the tea and herb field.  Through his experience, training and schooling, and as described herein, Mr. Cooper is internationally recognized as an inventor of new and unique tea products.

**B.**     **Development Of An Espresso Machine Tea**
           **Product And A Home Market For That Product**

15.     Mr. Cooper and his companies have for years been involved with packing tea into various containers and selling those products to others.  One company with which Mr. Cooper previously has done business in this capacity is Starbucks.

16.     In approximately 1997, Mr. Cooper was asked to and he did make arrangements to supply certain tea products to Starbucks.  One of these products was a Chai tea concentrate. As originally contemplated, the raw Chai blend to be developed by Mr. Cooper was to be sent to an extraction company, which would extract and concentrate the tea blend, packing it into a shelf-stable container.  The consumer, which could be individual Starbucks store operators, would then add the liquid concentrate to water or milk, creating a consistently flavorful cup of tea.  However, Mr. Cooper recognized that use of micro-contamination of storage tanks and tea dispensers, which are commonly used to store bulk amounts of a single type of tea for tea service was often problematic.  These realizations prompted Mr. Cooper to think about utilizing a different method of allowing an end user to produce a quick and consistent cup of tea. Subsequently, Mr. Cooper came to realize that if he could invent a system for brewing a consistently flavorful cup of tea using existing espresso equipment, he could potentially create a new specialty brewed tea product which would not be subject to micro-contamination.  Mr. Cooper decided to try and develop such a system.

17.     The first step in Mr. Cooper's development process was to fill a "Portafilter" (a common component of all espresso machines (*see* Ex. 1, which is incorporated by reference herein)) with a commercial Chai tea blend, lock the Portafilter into an espresso machine and activate the machine.  To his surprise, the machine produced a very thin, useless trickle of tea

concentrate.  Upon investigation, Mr. Cooper found that the Chai blend had, in fact, compacted into a solid lump of material which prevented the extraction of tea essences from the tea material.  Mr. Cooper thereafter retried the experiment, but by including less tea blend in the Portafilter.  Fluid flow through the Portafilter was better, but the concentrate was still very weak.

18.     From these and subsequent experiments, Mr. Cooper determined that there needed to be more Chai tea in the Portafilter, but that the particle size of the tea blend needed to be adjusted.  Specifically, the tea blend needed be cut in a way to allow the passage of pressurized water and steam therethrough (which would extract the tea essences from the organic tea material) without leading to the material clumping.  Through significant experimentation, Mr. Cooper developed a blend of Chai tea where each ingredient thereof (Chamilra sinensis, cinnamon, cardamom, nutmeg, pepper, cloves, etc.) had a different "cut" size.  Mr. Cooper found that the combination of total proper material weight and proper material "cut" size worked well in producing a consistent cup of flavorful brewed Chai tea with the use of a typical espresso machine.  Mr. Cooper next came to understand that the system he was then developing would also likely work well with other tea blends and could be used to produce an excellent tea concentrate from those blends.  Based upon additional significant experiments, Mr. Cooper developed a range of tea cut sizes and tea amounts which would work well in making various cups of tea with espresso machines.

19.     Knowing the correct amount of tea and the particle size thereof allowed Mr. Cooper to produce consistently excellent tea concentrates.  The concentrates could be put into a cup for hot tea or poured into a glass filled with ice to produce an outstanding iced tea, where the entire process from putting the tea into the Portafilter to taking the first sip of tea took just over

15 seconds.   At that point, Mr. Cooper felt he had developed a unique idea which could revolutionize how tea would be brewed in the future.

20.   Next, Mr. Cooper realized that consumers would have a difficult time placing the exact amount of tea into a Portafilter to create a consistently good end product.   Too much tea and the blend compacts; too little, and the tea is too weak.   Mr. Cooper thus came to appreciate the need for standardizing the tea preparation to compensate for the wide variations in experience among espresso machine operators and in the espresso machines themselves.   To overcome these problems, Mr. Cooper next developed the "pod" concept.

21.   The pod concept was essentially to place within a container or "pod" the proper amounts of a particular tea blend of a proper cut size.   The container would be sealed to preserve flavor and provide suitable shelf-life and would have an internal compartment that would permit water and steam to flow through the cut tea.   Through further experimentation, Mr. Cooper came to realize that the pod concept worked perfectly and a new tea product was born.

22.   No one prior to Mr. Cooper had figured out how to produce a consistently high quality tea using technologies traditionally designed for a large and widespread installed base of coffee and espresso beverages.   Mr. Cooper's invention involved both a product and a process for the production of customized, single serve, freshly brewed tea beverages which can be prepared in seconds, and which eliminated the need for large tea storage tanks and tea dispensers.

**C.**   **The '672 Patent**

23.   Mr. Cooper is now the sole inventor of a novel system and method for preparing a tea extract of consistently high quality using a coffee brewing device, such as an espresso machine.   Mr. Cooper filed a patent application on January 13, 1998 and obtained issued U.S.

Patent No. 5,895,672 on April 20, 1999, entitled "Product and Process for Preparing a Tea Extract" ("the '672 Patent").   (A copy of the '672 Patent is attached as Ex. 3, which is incorporated herein by reference.)   The '672 Patent has 26 claims and cites 23 prior art patent references, the earliest dating from 1979.   The United States Patent and Trademark Office ("USPTO") issued a first office action notice of allowance for Mr. Cooper's novel and non-obvious claimed invention.

24.     As the sole inventor, Mr. Cooper was the sole owner of the '672 Patent.   He has since assigned all right, title and interest in the '672 Patent, including the right to collect damages for past, present and future damages for infringement thereof, to Teashot.   That Assignment has been recorded at Reel 027217, Frame 0977 of the USPTO Assignment and Recording Branch.

25.     One embodiment of Mr. Cooper's patented invention relates to a tea extract system that  includes a tea extraction container for containing a tea composition that has a sealed body having at least one internal compartment which contains the tea composition.   The sealed body is constructed to include a water-permeable material which allows the flow of a fluid through the sealed body to produce a tea extract from the tea material, sometimes referred to as the tea composition.   In a preferred embodiment, the tea composition comprises from about 2 grams to about 10 grams of a tea material having a particle size of from about 0.40 mm to about 0.75 mm.

26.     Independent Claim 1 the '672 Patent reads:

A tea extract system for production of a serving of tea extract in a coffee brewing device, comprising:
(a) a tea extraction container for containing a tea composition, said tea extraction container comprising a sealed body having at least one internal compartment, said internal compartment containing said tea composition;

wherein said sealed body is constructed of a water-permeable material which allows flow of a fluid through said sealed body to produce a tea extract from said tea composition; and,

(b) a tea composition comprising from about 2 grams to about 10 grams of tea having a particle size of from about 0.40 mm to about 0.75 mm.

27.   Independent Claim 20 of the '672 Patent reads:

A tea composition for producing a tea extract in an espresso machine, comprising from about 2 grams to about 10 grams of a tea having a particle size of from about 0.40 mm to about 0.75 mm.

28.   Independent Claim 21 of the '672 Patent reads:

A method for producing a tea extract in a coffee brewing device, comprising the steps of:

(a) providing a tea extract system comprising:

(i) a tea extraction container for containing a tea composition, said tea extraction container comprising a sealed body having at least one internal compartment, said internal compartment containing said tea composition;

wherein said sealed body is constructed of a water-permeable material which allows flow of a fluid through said sealed body to produce a tea extract from said tea composition; and,

(ii) a tea composition comprising from about 2 grams to about 10 grams of a tea having a particle size of from about 0.40 mm to about 0.75 mm;

(b) placing said tea extraction system into a brewing chamber of a coffee brewing device; and,

(c) operating said coffee brewing device to extract a tea extract from said tea composition.

29.   As these claims demonstrate, one component of Mr. Cooper's invention was enclosing about 2 to 10 grams of a tea composition having a particle size of about 0.4 to about 0.75 mm within a fluid-permeable container.

**D.**   **The Unsuccessful Challenge to Mr. Cooper's Patented Invention In Europe**

30.     In addition to his issued U.S. patent, Mr. Cooper also was separately and independently granted European Patent 1054610 entitled "Product and Process for Preparing a Tea Extract" by the European Patent Office.  That European patent was subject to an opposition proceeding where Mr. Cooper's competitors in the tea business attempted to invalidate the claims of Mr. Cooper's European patent.  The opposition proceeding was commenced by Ostfriesische Tee Gesellschaft Laurens Srethmann GmbH & Co. Kg, a very large European concern engaged in the global tea industry.  Subsequently a second competitor joined the proceeding.

31.     During that proceeding, the opponents primarily relied upon U.S. Patent No. 5,776,527 ("the '527 Patent"), in combination with documents disclosing common "infusion" style tea bags, to claim the European patent was invalid.  (*See* Notice of Opposition attached as Ex. 4 and incorporated herein by reference; *see also* U.S. Patent No. 5,776,527 attached as Ex. 5 and incorporated herein by reference.)  Specifically, the opponents asserted that the claimed inventions were obvious when one combined the teachings of the '527 Patent (identified as Document D1 in the opposition or a related reference identified as Document A2) with common "infusion" tea bags (called References A3 to A11 in the opposition).  In rejecting the opposer's positions, the European Patent Office relevantly stated:

> The opposition division agrees with the opponents that the documents D1, or alternatively A2, can be considered as the closest prior art because it discloses a method for producing a serving of tea extract comprising the largest number of process steps disclosed in claim 1 of the opposed patent, in particular it discloses the use of an espresso machine to extract a tea composition contained in a tea extraction container. It is to be noted the document A2 cited by opponent 2 as the closest prior art is a family member of document D1 cited by opponent 1 as the closest prior art and the disclosure of document A2 corresponds to that of document D1.

The document D1 discloses a method for producing a serving of beverage by using a filterpad containing a substance to be brewed in an espresso machine. The document D1 discloses at column 3, lines 54-57, the possibility of employing a tea extraction container (prefilled bag) containing a tea composition.

The document D1 fails to disclose that the tea composition used in the prefilled bag comprises from 2 grams to 10 grams of tea having a particle size of from 00.40 mm to 0.75 mm.

The technical problem solved by these features is to consistently produce high quality tea extracts from an espresso coffee machine.

The opposition division finds that the choice of providing the tea extraction container with a tea composition comprising from 2 to 10 grams of a tea having a particle size between 0.40 and 0.75 mm involves an inventive step for the following reasons:

- with regard to the allegation of both opponents that the choice particle size range of 0.40 to .75 mm does not involve an inventive step, it is noted that the tea bags mentioned by the opponents as being available to the market before the priority date of the opposed patent were not intended to be used in an espresso coffee machine, but rather in the conventional infusion procedure. The invention to which claim 1 of the opposed patent relates deals with using a tea extraction container in an espresso machine, thus according to a brewing process which is quite different than the conventional infusion due to its brevity and to the presence of brewing water under pressure. It should be further noted that, apart from the abovementioned general comments in the prior art about using a prefilled bag containing tea in an espresso machine, no further teaching is available in the prior art concerning the details of the practical implementation of a process of brewing tea using an espresso machine. Therefore, the invention lies in the identification of a set of parameter ranges, i.e. weight and particle size of the tea composition, necessary for obtaining a good quality tea from a tea extraction process, i.e. in an espresso machine, about which no specific teaching is available in the state of the art. The weight and particle size ranges given in claim 1 of the opposed patent constitute a restricted range in comparison with the typical values, falling between 0.2-0.4 and 1.2-1.4 mm according to the documents submitted by the opponents, adopted for the conventional tea bags and are considered to indeed provide a tea of improved quality compared to tea compositions falling outside of the claimed range. . . .

- with regard to the allegation of opponent 2 that the person skilled in the art faced with the technical problem of obtaining good quality tea from the espresso machine of document A2 would first try a common tea bag available to the market at the priority date of the opposed patent, and by doing so he would use a

tea container comprising a tea composition as described in claim 1, such allegation is also not considered founded by the opposition division: the opponent submits in document A12.1 a table containing a list of tea bags allegedly available on the market before the priority date of the opposed patent whose content has been analysed in terms of its particle size: in the table, for each tea bag type the weight of the bag content and the percentage in weight of the particles within different size ranges is given. If using this data one calculates for each tea bag type the weight in grams of the tea particles falling within the range 0.4-0.8 mm available in the tea bag, one finds that all the tea bags listed in A12.1 contain less than 2 grams of tea having a particle size from 0.4 to 0.8 mm, i.e. none of the tea bags listed in document A12.1 satisfies the requirements set forth in claim 1 of the opposed patent.

The documents A3 to A11 submitted by opponent 2 disclose that the tea quality "Fannings" was primarily employed in the production of tea bags, that the tea particle size of such quality is between 0.4 and 1.0 mm and that the tea bags have typically a weight between 1.5 and 4.0 grams. Examples of tea bags and their weight are given in documents A 9 and A10. From the information given it is not possible to assess which is the weight content of tea having particle size between 0.4 and 0.75 mm in each of the tea bags listed in A9 and A10, but given the fact that all but one of the tea bags listed had a weight of 3 grams or lower and that the particle size of the tea quality "Fannings" material contained in the bags was between 0.4 and 1.0 mm, it cannot be concluded that these tea bags contained a tea composition comprising at least 2 grams of tea having a particle size of from 0.4 to 0.75 mm, as required by claim 1 of the opposed patent.

The results submitted by opponent 1 on three tea bags allegedly available before the priority date do not allow to draw a conclusion on the weight content of tea having particle size between 0.4 and 0.75 mm in these three tea bags.

The opponent notes that 85% of the tea contained in the tea bags "Sainsburys Red Label Round Teabags" falls within the range 0.3-0.6 mm, this is however not the range mentioned in claim 1 of the opposed patent and is further not particularly relevant given the high percentage of tea particles in the range 0.3-0.425. In this regard, it should be then remarked that according to the results in 0.3 only 55% of the tea falls within the range 0.425-1.0 mm, a more relevant value given the low percentage of tea particles in the range 0.6-1.0 mm. If one considers that the tea bags "Sainsburys Red Label Round Teabags" have a weight of 3.125 grams, one can conclude that these bags contained less than 2 grams of a tea composition having particle size between 0.425 and 1.0 mm.

In summary, it can be concluded that no evidence is available to even prove that at least one infusion tea bag available on the market before the priority date of the opposed patent contained a tea composition comprising from 2 to 10 grams of a

tea having a particle size of from 0.4 to 0.75 mm as required by claim 1 of the patent in suit.

Consequently, the subject matter of claim 1 of the opposed patent is considered to involve an inventive step (Articles 52(1), 56 EPC) with regard to the prior art.

(Ex. 6, pp. 14-17.)

32.     In other words, Mr. Cooper was the first inventor of a tea pod containing a tea composition comprising from 2 to 10 grams of tea having a particle size of from 0.4 to 0.75 mm for use in coffee brewing machines.  These same inventive claims are included in the '672 patent.

**E.     Mr. Cooper Offered The Patented Technology To Starbucks In 1999**

33.     Mr. Cooper shared the tea pod system concept with Starbucks on June 12, 1997 under terms of confidentiality.  As explained by Mr. Cooper, the system could have been part of an overall strategic tea plan for Starbucks.  That overall strategy was to bring tea into the Starbucks stores, and then to develop a market for customers to brew tea similar to that available at the stores consistently at home using a then still to-be-developed unique home tea brewing equipment.  (*See* Ex. 2, incorporated by reference herein.)

34.     Starbucks indicated the new tea pod strategy had merit and they were going to implement the strategic plan by having Mr. Cooper pack Starbucks tea products.  Unfortunately, Starbucks subsequently and without warning scrapped its packaging deal with Mr. Cooper, deciding instead to purchase its tea products from Tazo Tea Company ("Tazo").  This occurred in approximately late 1998.

35.     After Mr. Cooper learned the '572 Patent was to issue, he again contacted Starbucks to discuss a different potential business arrangement.   In a January 1999 communication, Mr. Cooper relevantly wrote:

Jerome Conlon and Cherilyn Whalen were very interested in the concept as well and I told them that I had filed the patent but would be delighted to share with them my thoughts and products.  Since then there have been a number of personnel shifts within your company but we have continued [to] demonstrate to Starbucks management how the concept works via presentations and showings in Boulder and in Seattle.

I am sure I have made very clear my desire to work with Starbucks on this project.  I have mentioned a number of times to the Starbucks management that I have not shared this concept with any other company as I truly believe that Starbucks is the company that can revolutionize the way tea is served . . . .

At our finger tips is a method of brewing an [sic] glass of iced tea within 30 seconds and dispensing with all of the old fashioned, heavy storage tank systems.  The new method allows for a wide selection of <u>fresh brewed</u> teas to be offered to the public in a revolutionary manner.

You can understand how disappointed I was when I was told in December that your presentation on the tea pod business idea had been postponed until the new year.

* * *

Although I would still be willing to offer a major company <u>exclusive</u> worldwide rights to my invention, my patent counsel suggests that I seriously consider offering numerous non-exclusive licenses to a multitude of entities in an attempt to maximize revenues.  However, I know what a hassle administering such a set up would be and I would prefer to deal with a single, large entity with global abilities.

* * *

I continue to believe that Starbucks is the right company for this idea.  Starbucks clearly has a global vision and I believe the ability to serve fresh brewed iced tea within 30 seconds would be a good fit within such a global strategy.

(*See* Ex. 7 attached and incorporated by referenced herein.)  Mr. Cooper's system was ultimately shown to a number of Starbucks' employees and representatives, including Howard Schultz, the Chief Executive Officer of Starbucks.

36.     However, the patented product was not then adopted by Starbucks.   Upon information and belief, Starbucks acquired Tazo for $8.1 million in 1999.   Mr. Cooper

subsequently brought suit against Starbucks for breach of the tea packing contract, among other things.  That action was subsequently resolved under terms of confidentiality.

37.     As we shall now see, Starbucks decided to adopt Mr. Cooper's tea pod technology, but without compensating Mr. Cooper for his development efforts or his rights under the '672 Patent.

**F.     Marketing Of The Technology To Others**

38.     Once Starbucks tossed Mr. Cooper aside for a second time, he began a new marketing campaign.  First, he developed a commercial to demonstrate the benefits of his tea pod system.  Second, he sent that commercial to several potential customers for his technology.  One group interested in the technology was Salton, Inc. ("Salton").

39.     Subsequently, Salton reached an agreement with Mr. Cooper to sell his tea pods for use in its Melita® 1:1 Single Serving Coffee Machine.   Under that royalty-bearing agreement, Mr. Cooper produced and supplied "Cooper's Tea Pods" to Salton for resale to others.  Since then, others have also licensed Mr. Cooper's tea pod technology.

**G.     The Infringing Keurig K-Cup® Product**

40.     GMCR claims through its recent 10-K Statement, filed in 2010 with the U.S. Securities and Exchange Commission, to be a leader in the specialty coffee and coffee maker business.  It states that a significant driver of its growth continues to be sales of the Keurig single-cup brewing system, which includes the Keurig® Single-Cup Brewer, K-Cup® Portion Packs used by the system, as well as related accessories.  GMCR claims to manage its operations through two business segments, the Specialty Coffee Business Unit ("SCBU") and the Keurig Business Unit ("Keurig").

41.     According to its 10-K Statement, SCBU sources, produces and sells more than 200 varieties of coffee, cocoa, teas, and other beverages in K-Cup® Portion Packs for use both at home ("AH") and away-from-home ("AFH").  Also according to GMCR's 10-K Statement, these varieties are sold primarily through North America wholesale channels, including supermarkets and convenience stores, in restaurants and hospitality providers, to office coffee distributors and directly to consumers via  its website, www.greenmountaincoffee.com.   In addition, SCBU claims to sell Keurig Single-Cup Brewer products and other accessories directly to consumers and to supermarkets.

42.     Keurig is identified in GMCR's 2010 10-K Statement as being a pioneer and leading manufacturer of gourmet single-cup brewing systems.  According to that same statement, Keurig targets its premium Single-Cup Brewing System for use both AH and AFH, mainly in North America.  Keurig sells AH Single-Cup Brewers, accessories and coffee, *tea*, cocoa and other beverages in K-Cup® Portion Packs produced by SCBU (and other licensed roasters) to retailers, primarily by processing its sales orders through fulfillment entities for the AH channels.  Keurig sells AFH Single-Cup Brewers to distributors for use in offices.  Keurig also sells AH brewers, a limited number of AFH brewers and K-Cup® Portion Packs directly to consumers via its website, www.keurig.com.

43.     The tea "K-Cups" manufactured by GMCR and sold by both GMCR and Keurig consist of a sealed container with an internal filter and tea.  In order to brew a fresh cup of tea, consumers place a K-Cup® in a receptacle at the top of a Keurig brewer and close the lid.  As the lid is closed, needles puncture the top and bottom of the cartridge. The user then selects the desired brewing parameters and hot water and steam is forced into the cartridge from holes

formed by the top needle, through the tea and filter, and exits the bottom through a hole formed by the bottom needle into the user's cup.

44.     Upon information and belief, GMCR and Keurig sell one or more tea extract systems for production of a tea extract in a coffee brewing device which infringes upon the '672 Patent.   By way of example only, the Keurig Models B200, B150, B155 and OfficePRO™ Brewing Systems utilize a tea extraction container (i.e., K-Cup®) comprising a sealed body having at least one internal compartment containing a composition of tea from about 2 grams to about 10 grams and having a particle size from about 0.40 mm to about 0.75 mm.   The sealed body is constructed of a water permeable material which allows fluid to flow through the sealed body to produce a tea extract.

45.     By way of further example only, GMCR and Keurig also manufacture and sell on their own behalf and to other distributors and retailers, tea compositions for producing a tea extract in a coffee brewing device wherein the tea has a particle size of about 0.40 mm to about 0.75 mm and weighs from about 2 grams to about 10 grams.   Specifically, GMCR and/or Keurig offer at least 48 varieties of different teas provided in containers and for use in systems and methods that infringe one or more of the '672 Patent claims, each of those tea varieties listed in the following screen shot from Keurig's own website:



View options

Sort by [Brand ▾]

◄ Prev 1 2 Next ►
(Items 1-25 of 48)
Display
[25 per page ▾]





Twinings® of
London

English Breakfast
Tea



Celestial
Seasonings

English Breakfast
Black Tea



Celestial
Seasonings

Sleepytime®
Herbal Tea



Celestial
Seasonings

Decaf Green Tea



Celestial
Seasonings

Mandarin Orange
Spice® Herbal
Tea

    



Twinings® of
London

Earl Grey Tea



Celestial
Seasonings

India Spice Chai
Tea



Twinings® of
London

English Breakfast
Decaf Tea



Celestial
Seasonings

Green Tea



Café Escapes

Chai Latté
Specialty

    

18


Bigelow
English Breakfast
Tea


Celestial
Seasonings
Lemon Zinger®
Herbal Tea


Timothy's®
Variety Coffee
and Tea Box


Twinings® of
London
Earl Grey Decaf
Tea


Bigelow
Green Tea








Celestial
Seasonings
Variety Tea Box


Bigelow
Chai Green Tea


Twinings® of
London
Pure Peppermint
Tea


Bigelow
Earl Grey Tea


Bigelow
Pomegranate
Green Tea








Celestial
Seasonings
Victorian Earl
Grey Tea


Gloria Jean's
Chai Tea


Twinings® of
London
Pure Camomile
Tea


Bigelow
Orange & Spice
Tea


Bigelow
I Love Lemon Tea



*Products for Trial are Only Available Through a Distributor

 Prev 1 2 Next ➤

(Items 1-25 of 48)

*Member Price reflects your Coffee Club membership pricing. Please sign in to your account or create an account to ensure up-to-date membership level pricing.

☒

Continue Shopping       ● View Cart

GMCR offers many of these same K-Cups® for sale through its own website.

46.      Keurig's patent counsel brought the '672 Patent to the attention of the USPTO in connection with one of Keurig's own patent applications directed to a disposable beverage filter cartridge.   That application matured into U.S. Patent No. D502,362.   Keurig, and thereby GMCR, had knowledge of the '672 Patent at least as early as 2004.   Accordingly, Keurig's and GMCR's sale of the infringing tea-filled K-Cups® should be considered to have been conducted with knowledge of and disregard for Teashot's patent rights and thus willful.

**H.      Starbucks' Infringing Conduct**

47.      Starbucks announced that since November 2011 it has been the exclusive licensed super-premium coffee brand for the Keurig® Brewer.   Starbucks has stated that "two selections

of Tazo tea will be available in K-Cup® Portion Packs: Tazo® tea Awake and Tazo® tea Zen."

Starbucks also reports that:

> In addition to the introduction of Starbucks® coffee and Tazo® tea K-Cup® Portion Packs, Starbucks premium single-cup strategy led to an alliance last March with Courtesy Products, the nation's leading provider of in-room coffee service to hotels.  This will extend the Starbucks brand as the exclusive super-premium coffee offered in 500,000 premium and luxury hotel rooms in the U.S.

(*See* Ex. 8, attached and incorporated herein by reference.)   Upon information and belief, Keurig/GMCR produced or had produced these tea filled K-Cup® Portion Packs for Starbucks.

48.     The Tazo® tea Awake and Tazo® tea Zen K-Cups® meet the requirements of claims set forth in the '672 Patent and thus the sale thereof by Starbucks and use by its customers is an infringement of the '672 Patent.  Also, Starbucks had knowledge of the '672 Patent as early as 1999.  Indeed, Starbucks was offered a license to the technology covered by that '672 Patent, which offer was rejected.   Starbucks' sale of the infringing tea-filled K-Cups® should be considered to have been conducted with knowledge of and disregard for Teashot's patent rights and should thus be considered willful.

## V.  CLAIM FOR RELIEF
(Infringement of the '672 Patent)

49.     Teashot incorporates paragraphs 1 through 48 as though fully set forth herein.

50.     Teashot owns the '672 Patent, which was duly and legally issued.

51.     GMCR, Keurig and Starbucks have directly infringed one or more claims of the '672 Patent in violation of 35 U.S.C. § 271 by making, using, importing, selling and/or offering for sale tea filled K-Cups® and systems that employ the same and/or actively and knowingly inducing infringement and/or contributing to infringement of the '672 Patent by their customers to whom they supply tea-filled K-Cups®.

52.     Upon information and belief and during all relevant times, products authorized by Mr. Cooper and Teashot which practice one or more of the inventions claimed in the '672 Patent have been appropriately marked under 35 U.S.C. § 287.

53.     Defendants' infringement of the '672 Patent was willful and in wanton disregard for Teashot's patent rights.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Teashot prays for judgment in its favor and against Keurig as follows:

A.     That Defendants, their officers, directors, agents, servants**,** employees, privies, representatives, attorneys, parent and subsidiary corporations or other related entities, successors, assigns, licensees, retail distributors, and all persons in active concert or participation with any of them, be permanently enjoined from directly or indirectly infringing, inducing others to infringe and/or contributing to the infringement of the '672 Patent;

B.     That Teashot be awarded damages in an amount to be determined at trial for Defendants' infringing activities, which are at least a reasonable royalty;

C.     That Teashot be awarded treble damages by reason of the willful, wanton, and deliberate nature of Defendants' infringement pursuant to 35 U.S.C. § 284;

D.     That Teashot be awarded punitive damages;

E.     That Teashot be awarded its pre-judgment and post-judgment interest;

F.     That Teashot be awarded costs and expenses of suit, including expert witness fees;

G.     That Teashot be awarded its attorneys' fees as this is an exceptional case under 35 U.S.C. § 285;

H.    That Defendants be ordered to deliver to Teashot, for destruction at Teashot's option, all products that infringe the '672 Patent;

I.    That Defendants be required to account for all gains, profits, advantages, and unjust enrichment derived from its violations of law; and

J.    That Teashot be awarded other and further relief as the Court deems appropriate and just.

## VII.  JURY DEMAND

Teashot requests a jury trial on all issues so triable.

Respectfully submitted,

Dated:  January 24, 2012          By:    s/ Robert R. Brunelli
                                         Robert R. Brunelli
                                            *rbrunelli@sheridanross.com*
                                         Todd P. Blakely
                                            *tblakely@sheridanross.com*
                                         Joseph E. Kovarik
                                            *jkovarik@sheridanross.com*
                                         Ian R. Walsworth
                                            *iwalsworth@sheridanross.com*
                                         SHERIDAN ROSS P.C.
                                         1560 Broadway, Suite 1200
                                         Denver, Colorado  80202-5141
                                         Telephone:  (303) 863-9700
                                         Facsimile:  (303) 863-0223
                                         E-Mail:  litigation@sheridanross.com

                                         ATTORNEYS FOR PLAINTIFF TEASHOT.LLC